IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES R. DOWNES, #281824, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:19-CV-469-MHT-CSC |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I.  INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on a complaint filed on July 2, 2019, by James R. Downes, a state inmate, in which he alleges that the Defendants acted with deliberate indifference in providing medical treatment for his back and neck issues.  Specifically, Downes alleges that beginning in September 2018 and continuing until the time he filed his complaint, the Defendants have been deliberately indifferent to his medical needs.  (Doc. 1 at pp. 3-7).  He names as Correctional Defendants Alabama Department of Corrections and Walter Myers, Warden. (Doc. 1 at p. 1).  He also names as Medical Defendants Wexford Health Sources, Inc., Dr. Wilson, Dr. Hood, and P.A. Driggers, Medical Supervisor. He does not specify whether he sues the Defendants in their individual or official capacities and he seeks money damages.  (Doc. 1 at p. 7).

The Defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits, addressing the claims raised in the complaint, as amended.  In these

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk in the docketing process.

documents, the Medical and Correctional Defendants maintain they did not act with deliberate indifference to Downes' medical needs.  (Docs. 38, 41).

After reviewing the special reports filed by the Defendants, the court issued an order on September 10, 2019, directing Defendants to file a response to each of the arguments set forth by the Defendants in their reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  (Doc. 42).  The order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law."  (Doc. 42 at p. 3).  Downes filed a sworn response to this order on January 21, 2020.  (Doc. 47).  Thereafter, Downes filed Supplements to his Response (Docs. 47, 51 and 53), which this court construed as Motions to Amend and denied them, among other reasons, as untimely and advised the Plaintiff that he could file a separate action to raise these new claims which were not presented in his Complaint.  (Doc. 48, 52, and 54).

## II.  STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case

under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

### III.  FACTS

In their special report the Medical Defendants deny they have acted with deliberate indifference to Downes' conditions related to his back, neck and nerves. The Medical Defendants assert that medical personnel at Easterling have provided treatment to Downes in accordance with their professional judgment.  They further assert that they referred Downes to a free-world neurosurgical specialist for treatment and, based on the specialist's findings, an additional referral is neither necessary nor warranted at this time.  In addressing Downes' claims regarding the treatment provided for his back and nerve issues, Dr. Philip Wilson, the Medical Director at Easterling, provides the following information:

> My name is Philip Wilson, M.D. I am over the age of nineteen (19) years and I have knowledge as to all matters stated herein.

I am a medical doctor licensed to practice medicine in the State of Alabama. I am currently the Medical Director at the Easterling Correctional Facility located in Barbour County, Alabama. I have officially been the Medical Director at the Easterling Correctional Facility since January 21, 2019. However, I did not start seeing patients at Easterling until February 21, 2019.

I am employed by Wexford Health Sources, Inc. Wexford currently holds the contract with the Alabama Department of Corrections to provide health care related services to Alabama state incarcerated inmates. Wexford has held the contract with the Department of Corrections since April 1, 2018.

I have reviewed the legal Complaint that has been filed by Alabama state inmate James R. Downes (AIS# 281824). I am aware that Mr. Downes alleges that he has received inadequate medical care during his incarceration with the Alabama Department of Corrections.

I am aware that Mr. Downes alleges that in September 2018, he was taken to the Baptist Hospital in Montgomery, Alabama for issues related to his groin and that he received inadequate health care since that time.

I have attached, in chronological order, pertinent medical records pertaining to Mr. Downes' medical treatment while an inmate with the Alabama Department of Corrections.

The medical records reveal that on February 25, 2018, Downes refused recommended medical examinations and testing that were recommended by Downes' medical providers.

On September 29, 2018, Mr. Downes was found to have a boil on his right testicle. The nurse noted on the medical chart that Mr. Downes was experiencing swelling and moderate draining to his right testicle. Swelling was also noted to Mr. Downes' left testicle. Mr. Downes' testicles were noted to be very sensitive to touch. A culture was obtained.

The medical records set forth that Mr. Downes was placed in the infirmary at the Easterling Correctional Facility due to the abscess noted on his testicle. The medical records reveal that Mr. Downes had complained of pain and swelling for five days in his right scrotum.

Mr. Downes was seen by Laura E. Driggers, CRNP, [at Easterling] on October 1, 2018. Ms. Driggers noted that Ms. Downes had a history of swelling and drainage to his scrotum. Ms. Driggers further noted that Mr. Downes had been non-compliant with his prescribed medications.

On October 2, 2018, Mr. Downes was sent to Baptist Medical Center South in Montgomery, Alabama for consults with outside medical specialists. The medical notation from October 2, 2018, from Baptist Medical Center South indicates that Mr. Downes was admitted to the hospital due to diabetes; end stage renal disease, hypertension, and scrotal wall abscess.

The note from Baptist Medical Center South dated October 2, 2018, states in part as follows:

> You were admitted with scrotal abscess and incision and debridement was done and you were treated with antibiotics. Please take your medications as prescribed. He needs to be on a wet to dry dressing [change] twice daily with Di-Bak Dakins. He had high blood pressure this admission, and we added Amlodipine 10 mg and Coreg 6.25 mg. twice daily. You need to be on that from now onwards. You had acute kidney injury when you were here, we got tunneled catheter placed and you need to get dialysis as per nephron recs. Please monitor his renal function closely. Please follow up with Dr. Habermacher urologist at Multi Specialty Clinic in two weeks after discharge. Please go to the nearby ED if your symptoms worsen. Please give him renal diet, with no fruit juices and no potassium containing foods as per nephron recommendations here, until his AKI resolves.

Mr. Downes was discharged from Baptist South on October 29, 2018. Mr. Downes' admission and discharge diagnoses was set forth as follows: Admission Diagnoses:

1. Scrotal swelling and pain
2. Type 2 diabetes Mellitus
3. Low albumin

Discharge Diagnoses:

1. Nonoliguric acute kidney injury secondary to acute tubular necrosis
2. Left shoulder pain, improved
3. Right scrotal abscess, status post incision and debridement on 10/03/2018
4. Hyperkanemia
5. Vitamin D deficiency
6. Hyperphosphatemia
7. Diabetes Mellitus Type 2
8. Hypertension
9. Pleural effusion, resolved

The physicians at Baptist South set forth in the discharge report the following with regard to the history of Mr. Downes' illness:

Mr. Downes is a 58 year old Caucasian gentleman, a resident of Easterling Correctional Facility, with past medical history of diabetes, MRSA infection, transferred from Dale Medical Center for scrotal swelling and pain management. According to him, he developed a small blister over his scrotum 4 days ago before the admission. He had gradual swelling of his scrotum with pain where he could not even stand or move due to pain. He also had some fever, diaphoresis, low abdominal pain and dysuria. The patient was treated with Vancomycin in the facility but he did not have any improvement. The patient was transferred to Dale Medical Center on 10/01/2018 with WBC of 12.9 with left shift and CT abdomen and pelvis showed scrotal cellulitis. On scrotal ultrasound, a complex fluid was also noted and he was given Zosyn, Clindamycin at Dale Medical Center and he was transferred to us for urological evaluation.

After he came here, he was started empirically on Vancomycin and Zosyn for MRSA and Gram-negative coverage. Blood cultures, urine cultures, and urology was also consulted. Blood cultures were positive for Bacillus. Urology was consulted and the patient was kept npo and he got incision and drainage done of his right scrotal abscess.

On admission, his Hba 1c was 10.6 and he was taking Metformin 850 b.i.d. at home and he was also on sliding scale, but we started him on sliding scale while he was here. On admission, he also had Albumin of 2.5 which would be secondary to protein calorie malnutrition. Incision and debridement of the right scrotal abscess was done on I0/03/2018. He was started on wet to dry dressing twice per day. Initially, he was on Vancomycin and Zosyn. The Zosyn was discontinued later and he was continuing on Vancomycin for a few days. He also had a Foley in place. On 10/06/2018, he developed AKI secondary to Nephrotoxic drugs.

During this admission, he was also hypersensitive and he was started initially on Thiazide and, on I0/16/2018, kidney function declined and he developed AKI, his Creatinine bumped up to 2.86. and gradually his Creatinine went up to 9. His BUN also increased from 19 to 28.

Vancamycin was stopped and he was held on his diuretics and for his blood pressure he was started on Anlodipine 10 daily and Coreg 6.25 twice daily. Meanwhile, he also developed some left upper extremity swelling and we did ultrasound to rule out any DVT and there was no DVT seen. Vancamycin was stopped and he was started on Cefepime and Flagyl, and Flagyl was stopped after that. Nephology was consulted for his A.K.I. Nephology was following him initially.

Initially, during this admission, he also had bilateral pleural effusions on CT scan of his chest. This could be most likely due to volume overload from his impaired renal function and he was Dialyzed initially. He also had Hyperkalemia during his admission.

He initially was treated with Kayexalate and he was kept on a renal diet with low potassium. His potassium was still high and he was treated with Albuterol and glucose, sliding-scale insulin and his serum creatinine and potassium were not trending down, they were all trending up, so nephrology was on board and they thought of getting him on dialysis and he got a temporary catheter and he got hemodialysis on an alternate day basis. On admission, his Creatinine was *5* and it came down to 4 and on the day of discharge, his Creatinine was at 4.65.

On day of discharge, the patient also got dialysis. As his kidney function was not improving with dialysis, Nephrology thought his AKI could be secondary to acute tubular necrosis and he might need some time for recovery of his kidneys, so patient was trying to get a permcath placed and he got permcath placed. Temporary catheter was removed and the patient got dialysis on the day of discharge and was discharged to St. Clair prison and is to get dialysis over there while he was here, and he was also getting wet to dry dressing changes twice per day.

Repeat x-ray during this admission showed no pleural effusions. Eventually, he was discharged on 10/29/2018 with follow up appointments and anti-hypertensive medication. His metformin was stopped during this admission as he had AKl and he was discharged with a renal diet with low potassium to be taken.

Upon release from [the] hospital Mr. Downes was seen by Wilcotte Rahming, M.D. at the infirmary at the Kilby Correctional Facility located in Mt. Meigs, Alabama. Dr. Rahming noted that Mr. Downes Mr. Downes was a 58 year old white male who was initially admitted to the hospital on October 2, 2018, for increased scrotal pain and swelling for 4 days prior to his admission. Mr. Downes was initially given Zosyn and other antibiotics. At the hospital in Montgomery, Mr. Downes underwent a debridement for a large scrotal abscess and was prescribed antibiotics due to MRSA. Due to complications arising from kidney issues, Mr. Downes was transferred to the St. Clair Correctional Facility,

The medical records set forth that Mr. Downes was seen [in the health care unit] on October 30, 2018 by the nursing staff at St. Clair Correctional Facility where Mr. Downes' chief complaint was that of scrotum pain.

On October 31, 2018, an x-ray was taken of Mr. Downes' chest due to a follow up for pleural effusion. The x-ray was read by the radiologist as follows:

Exam: Radiograph of the chest.

Technique: Frontal and lateral views of the chest are submitted.

Prior studies: No prior studies are submitted.

Findings: The lungs are clear. No pneumonia or suspicious pulmonary module/mass. No pleural effusion or pneumothorax. The heart borders, mediastinum and pulmonary vascular pattern are normal. No evidence of ASCVD. There are no acute bony abnormalities of the chest. The upper abdomen is unremarkable. Right internal jugular central lying catheter, the tip in the distal SYS.

Impression: No acute infiltrate. No effusion. Central venous catheter.

The medical records reveal that Mr. Downes was seen on a daily basis for the scrotal wound and the abscess was cleaned and dried and dressed on a daily basis by the medical staff and nurses at the St. Clair Correctional Facility.

The medical records reveal that while at St. Clair Correctional Facility, Mr. Downes was provided with a CPAP machine.

On January 17, 2019, Mr. Downes signed a Release of Responsibility form refusing a urology evaluation to evaluate him for possible prostate cancer which Mr. Downes was advised could be fatal if undiagnosed.

On January 31, 2019, Mr. Downes was seen complaining of back pain with a possible pinched nerve. Mr. Downes informed the medical provider that he had been suffering from back pain and right knee pain since 1998.

An x-ray was taken of Mr. Downes' lumbar spine on February 6, 2019. The x-ray was read by the radiologist as follows:

Exam: Radiograph of the lumbar spine

Technique: AP and lateral views of the lumbar spine are submitted. 3 images. Prior studies: No prior studies are submitted.

Findings: Study demonstrates a normal alignment of the lumbar spine. No compression fractures. No evidence of spondylolisthesis. Normal vertebral body heights. Disc space narrowing is not identified. Normal SI joints. Intact posterior elements. Normal perivertibral soft tissues.

Impression: Limited by under penetration. No acute osseous abnormality or severe degenerative disease identified.

On February 6, 2019, the medical records reveal that Mr. Downes was provided with a wheelchair profile for thirty (30) days.

Due to complaints of pain in the right ankle and right foot, x-rays were taken on March 13, 2019, all of which were negative. Follow up x-rays were taken of Mr. Downes' right ankle on April 10, 2019. Again, the x-rays were read as negative.

Due to Mr. Downes' continued complaints of back pain, an MRI was ordered which was taken on May 17, 2019. The radiologist who read the MRI noted as follows:

MRI of the thoracic spine without contrast.

Clinical history: 59-year-old male with surface pain in the chest/anterior skin from the neck to the pelvis, as well as pain into the right hip and leg. Complaints of numbness in the right foot with difficulty walking in the past two months.

Findings: Paraspinal soft tissues are unremarkable. Kyphosis is preserved. No posterior osteophyte formation. There is a small central disc protrusion at T10-T11 and at T11-T12, but no significant foraminal or central canal stenosis. Remaining disc levels are unremarkable. No fracture or suspicious osseous signal abnormality. No cord signal abnormality.

Impression:

Small disc protrusion centrally at T10-T11 and T11-T12 but no appreciable foraminal or central canal stenosis.

A lumbar spine MRI was also performed on May 17, 2019. The radiologist rad the lumbar spine MRI as follows:

Lumbar spine MRI without contrast.

History: 59- year-old male with pin in the anterior skin from the neck to the pelvis and extending into the right hip and leg. Also complains of numbness in the right foot and difficulty walking over the last two months.

Findings:

No appreciable fracture or suspicious osseous lesion. The conus lies at the level of T12. Paraspinal soft tissues are unremarkable. Lordosis is preserved.

L5-S1: Disc Desiccation with a mild circumferential disc bulge and moderate to severe facet joint DJD but no significant foraminal or central

canal stenosis.

L4-5: Moderate to severe facet joint DJD. No disc protrusion. No significant foraminal or central canal stenosis.

L3-4: No disc protrusion. Mild facet joint DJD. No foraminal or central canal stenosis.

L2-3: No disc protrusion. Facet joints are normal. No foraminal or central canal stenosis.

Ll-2: Normal disc level.

Impression:

Predominantly facet joint DJD particularly at L4-5 and L5-S1.

In July 2019, Mr. Downes underwent physical therapy. The physical therapy notes from July 2019 [are] set forth as follows:

In my professional opinion, this client requires skilled physical therapy in conjunction with a home exercise program to address the problems and achieve the goals outlined below. Overall rehabilitation potential is good. Expected length of this episode of skilled therapy service is required to address the patient's condition is estimated to be six weeks. The patient has been educated regarding their diagnosis, prognosis and related pathology. The patient exhibits good understanding and performance of the therapeutic activity/instructions outlined during skilled rehabilitation session. Patient has multiple back ailments impacting POC. Presentation is evolving due to decrease in function and increase in pain. Presents with deficits of weakness, ROM, pain, flexibility, ADL performance, and work capacity. VC and TC required for proper technique during therex exercises. Moderate complexity evaluation performed. Decrease in pain following manual techniques.

Mr. Downes was in fact given physical therapy.

On August 7, 2019, Mr. Downes was seen by Patrick Ryan, M.D. at Montgomery Neurosurgical Associates. Dr. Ryan's notes from that date state as follows:

Date of visit: 08/07/2019

Attending physician: Patrick Ryan, MD

Chief complaint: Weakness. Patient states that they have had this problem before and they have not been hospitalized. Bilateral leg and foot pain. Bilateral foot numbness. Back pain 7/10. Abdominal pain. Hip pain. Low back and buttock pain. Low back and leg pain.

The source of information:

The history was obtained directly from the patient.

History of present illness:

The patient is a 59-year-old white male. He is referred to us for evaluation of the thoracic and lumbar spine. He has had significant pain since February 2019. He complains of pain in his feet bilaterally, the right worse than the left one. This is from the ankle to his toes. He has intense burning, shooting pain in this region, as well as numbness. The heels hurt less than the res[t] of his feet. He also complains of burning sensation and a hypersensitivity in his anterior thorax from his groin up to his chest. He states that it is sensitive to materials and this feels hot to the touch at night. He has some radiating pain in his mid-thoracic region anteriorly as well. He denies recent rashes or skin changes. He has some back pain, and has to rest frequently. During the course of his work up he received a thoracic and lumbar MRI, after which he was referred here for further recommendation. He is an inmate at Easterling Correctional Facility.

Dr. Ryan's medical notes of August 7, 2019, indicate that Dr. Ryan reviewed the thoracic spine and lumbar spine MRIs recently taken in May 2019. With regard to those studies, Dr. Ryan set forth as follows:

Thoracic spine MRI interpretation: The aforementioned studies were interpreted as unremarkable or within normal limits on an age adjusted basis.

Lumbar spine MRI interpretation: Degenerative disc changes are noted the lumbar spine diffusely.

Diagnosis: Unspecified abdominal pain and radiculopathy, lumbar region.

With regard to the treatment plan recommended by Dr. Ryan, he set forth as follows:

Treatment plan:

The patient may have some neuropathy so I would recommend an EMG/NCV. Also his abdominal pain would need to be evaluated by a general surgeon or someone similar. I do not see any neurosurgical intervention needed at this point. Continue with current conservative treatment.

Mr. Downes will be continued to be seen and treated for his necessary medical needs by me and the medical staff at the Easterling Correctional Facility.

The outside specialist neurosurgeon stated on 8/7/2019 that neurosurgical intervention was not needed at this point.

Mr. Downes' necessary medical needs have at no time been delayed or denied. Due to Mr. Downes' complaints of back pain, he has had MRIs of both the thoracic and lumbar spine and has been sent out to be seen by an outside neurosurgeon who has given his opinion that at this juncture no neurosurgical intervention is needed. Dr. Ryan recommended that current conservative treatment be continued.

Mr. Downes has been prescribed medicines specifically for his neuropathy.

An appointment is currently being scheduled for Mr. Downes to have the nerve conduction studies performed as recommended by Dr. Ryan.

I have personal knowledge of the medical treatment that has been provided to Mr. Downes during his incarceration with the Alabama Department of Corrections.

With my personal knowledge of Mr. Downes' medical conditions, Mr. Downes' treatment, and my review of Mr. Downes' medical file, it is my opinion that Mr. Downes has at all times been treated within the standard of care of physicians practicing medicine in the state of Alabama.

Doc. 39-1 at 2–13.  The medical records compiled contemporaneously with the treatment provided

to Downes support the affidavit submitted by Dr. Wilson.

# III.  DISCUSSION[2]

## A.    Deliberate Indifference Generally

The law is well-settled that establishment of both objective and subjective elements are necessary to demonstrate a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).  With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed].  Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty. Ala.,* 268 F.3d 1014 at 1028–29 (11th Cir. 2001) *abrogated on other grounds by Bell Atl. Corp v. Twombly,* 550 U.S. 544 (2007).  As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . .  [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 837–38 (1994); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).

---

[2] The court limits its review to the allegations set forth in the complaint. (Doc. 1).  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991). . . . Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*

## C.    Deliberate Indifference to Medical Needs.

Downes alleges that the Medical and Correctional Defendants have acted with deliberate indifference to Downes' conditions related to his back, neck and nerves. The Defendants deny these claims. Specifically, the Medical Defendants assert that medical personnel at Easterling have

provided treatment to Downes in accordance with their professional judgment.  They further assert that they referred Downes to a free-world neurosurgical specialist for treatment and, based on the specialist's findings, an additional referral was neither necessary nor warranted.  Furthermore, Downes alleges that Correctional Defendants, as wardens or correctional officers, are responsible for ensuring that he received appropriate medical treatment.  These assertions entitle Downes to no relief.

To prevail on a claim of denial of medical treatment, an inmate must show the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000). Medical treatment of prisoners violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quotation marks and citation omitted). A prison official is not "deliberately indifferent" unless he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (finding, under *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment") (citation and internal quotations omitted). "A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016). Within the Eleventh Circuit, medical malpractice and negligence do not constitute deliberate indifference:

> Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S.Ct. 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate

> indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

Thus, to demonstrate deliberate indifference to a serious medical need, Downes must show (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and his injury. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–1307 (11th Cir. 2009). To make this showing, Downes must establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (finding that for liability to attach defendant must know and disregard excessive risk to prisoner's health or safety).

Regarding the objective component, a plaintiff must first show an objectively serious medical need, followed by a response by defendants inadequate enough to constitute an unnecessary and wanton infliction of pain, not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law. *Taylor*, 221 F.3d at 1258. (Citations omitted). For the required subjective intent, a plaintiff must show the public official acted with an attitude of "deliberate indifference," which requires two things: an awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and drawing of the inference. *Taylor*, 221 F.3d at 1258 (internal citations and quotations omitted).

Thus, deliberate indifference occurs only when a defendant knows of and disregards an excessive risk to inmate health or safety; is aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and draws that inference. *Farmer*, 511 U.S. at 837. An "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Further, neither a difference of opinion on appropriate treatment nor the fact that the treatment was ineffective gives rise to a deliberate indifference claim. *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding mere fact that inmate desires different mode of diagnosis does not amount to deliberate indifference); *Adams*, 61 F.3d at 1545 (stating that whether additional diagnostic techniques or forms of treatment should have been used "is a classic example of a matter for medical judgment" and not a basis for Eighth Amendment liability) (citation omitted).  Indeed, when medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery County Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

Finally, in determining whether a delay in medical treatment constitutes deliberate indifference, courts consider the seriousness of the medical need, whether delay worsened the medical condition, and the reason for the delay. *See Goebert v. Lee Cty.*, 510 F.3d 1312, 1327 (11th Cir. 2007); *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003).  Additionally, when an inmate complains that a delay in medical treatment rises to the level of a constitutional violation, he "must place verifying medical evidence in the record" establishing the detrimental effect caused by the delay. *Surber v. Dixie Cty. Jail*, 206 F. App'x 931, 933 (11th Cir. 2006) (internal citation omitted).  Finally, the subjective knowledge of risk must be specific to that defendant because

"imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual defendant must be judged separately and on the basis of what that person [knew at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citations omitted).

1. **Medical Defendants.**

Downes asserts that the Medical Defendants denied him adequate medical treatment. The Medical Defendants adamantly deny they acted with deliberate indifference to Downes' medical needs during the time relevant to this complaint or at any other time. Instead, the Medical Defendants, submitted the affidavit of Dr. Philip Wilson, M.D. in response to the complaint filed by Downes which summarized the medical record and reported that the Plaintiff underwent physical therapy targeting his back pain in July 2019 and Dr. Ryan, the outside specialist neurosurgeon, stated after examination of Plaintiff on August 7, 2019, that neurosurgical intervention was not needed at that point. (Doc. 38-1 at p. 10-13). Dr. Wilson further opined that "Mr. Downes' necessary medical needs have at no time been delayed or denied." (Doc. 38-1 at p.13). Specifically, Dr. Wilson reported that "due to Mr. Downes' complaints of back pain, he has had MRIs of both the thoracic and lumbar spine and has been sent out to be seen by . . . Dr. Ryan [who] recommended that current conservative treatment be continued." *Id.* Further, Dr. Wilson stated that Plaintiff "has been prescribed medicines specifically for his neuropathy [and] an appointment is currently being scheduled for Mr. Downes to have the nerve conduction studies performed as recommended by Dr. Ryan." *Id.*

The medical records further demonstrate that on February 25, 2018, Downes refused to have his blood sugar checked, stated he would not take diabetic medication and signed a waver. (Doc. 38-1 at p. 2; Doc. 38-2 at p. 1). Furthermore, on September 29, 2018, the

records show that Plaintiff had a boil on his right testicle with swelling and moderate pain. (Doc. 38-1 at p. 2). On October 2, 2018, he was sent to Baptist Medical Center South where this condition and many others were treated until October 29, 2018, the day of his discharge. Prior to his discharge, he received dialysis. (Doc. 38-1 at pp. 3-6). The medical records also demonstrate that Plaintiff was seen by nurses at St. Clair Correctional Facility on October 30, 2018, and treated for scrotum pain. (Doc. 38-1 at p.7). Thereafter, Plaintiff was treated daily at St. Clair Correctional Facility for his scrotal wound and was also provided a CPAP machine. (Doc. 38-1 at p. 8). Finally, on January 17, 2019, Plaintiff signed a Release of Responsibility form refusing a urology evaluation for possible prostate cancer which Downes was advised could be fatal if undiagnosed. (Doc. 38-1 at p. 8, Doc. 38-1 at p. 168).

Dr. Wilson opined, based on his personal knowledge of Downes' medical treatment and review of the file, "it is my opinion that Mr. Downes has at all times been treated within the standard of care of physicians practicing medicine in the state of Alabama." *Id.* Indeed, the Court's independent review of the medical records confirms the testimony of Dr. Wilson and the treatment provided to Plaintiff for his neck and back pain and other medical conditions. (Doc. 38-1 at pp. 1-14; Doc. 38-2 at pp. 1-247).

Under the circumstances of this case, the court concludes that the course of evaluation and treatment undertaken by the Medical Defendants did not violate Downes' constitutional rights. Specifically, there is no evidence upon which the court could conclude that any member of the medical staff acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. Rather, the evidence before the court demonstrates that Plaintiff has received consistent medical treatment for his back and neck pain, scrotal abscess and other conditions. Whether medical

personnel "should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted).  In addition, to the extent Downes complains that his physicians should have prescribed pain relievers or pursued some other mode of treatment, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference.  In addition, Downes has failed to present any evidence showing that the manner in which the Medical Defendants addressed his condition created a substantial risk to his health that the attending health care personnel consciously disregarded.  Indeed, to the extent that Downes alleges that he was delayed treatment of his back and neck pain, the court likewise concludes this claim fails because Plaintiff has not "place[d] verifying medical evidence in the record" establishing the detrimental effect caused by the delay. *Surber,* 206 F. App'x at 933.  The record is therefore devoid of evidence—significantly probative or otherwise—showing that any medical professional acted with deliberate indifference to a serious medical need experienced by Downes.  Consequently, summary judgment is due to be granted in favor of the Medical Defendants.

2. **Correctional Defendants.**

To the extent that Downes argues that the Correctional Defendants acted in a manner to prevent him access to treatment from professional medical personnel the Court concludes that this argument lacks merit.  Indeed, it is clear from the medical records that the Correctional Defendants were not in any way involved in decisions regarding the medical treatment provided to Downes, as these decisions are made solely by healthcare professionals employed by the Jail.  Furthermore, Defendant Walter Myers, Warden at Easterling Correctional Facility, where Downes was incarcerated at all times relevant to the complaint, testified as follows:

"The Alabama Department of Corrections ["ADOC"] currently contracts with Wexford Health Sources to provide health care related services to inmates incarcerated at Alabama state correctional facilities.  At no time have I ever been involved in any decisions related to the health care of Mr. Downes, nor have I provided any health care to Mr. Downs.  At no time have I had any conversations with medical providers with regard to necessary medical care or treatment needed by Mr. Downes or provided to Mr. Downes. All medical decisions related to necessary medical health care were made at all relevant times by employees and/or medical providers employed by Wexford.

Mr. Downes states in his Complaint that he has received improper and/or refused medical treatment while an inmate with ADOC.  However, at no time was I ever responsible for determining necessary medical care to be provided to Mr. Downes.  I have no training and/or experience in the medical field.

The ADOC contracts with Wexford to make sure that all inmates incarcerated with the ADOC, including James R. Downes, received necessary medical treatment and/or care for their necessary medical needs.  At no time have I ever denied or delayed necessary medical care to Mr.

Downes due to the fact that I am not a trained medical provider and have never been asked to or had anything to do with medical care provided to Mr. Downes."

(Doc 41-1 at pp. 2-3).

Thus, Downes has failed to establish deliberate indifference on the part of the Correctional Defendants.  Specifically, Downes has not demonstrated that these Defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to Downes health.  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).  Consequently, summary judgment is due to be granted in favor of the Correctional Defendants on Downes claim alleging deliberate indifference arising from the actions of medical personnel in treating his back and neck pain and other conditions.

Insofar as Downes seeks to hold the Correctional Defendants liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198 Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that the Correctional Defendants exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . .  A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties.  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,* 268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.).  "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949.  Thus, liability for actions of the Medical Defendants could attach to the other named defendants only if these defendants "personally participate[d] in the

alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that the Correctional Defendants did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Downes. (Doc. 41-1). The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the evaluation and treatment of Downes based upon their professional judgment upon assessment of his physical condition. (Doc. 39-1 and 41-1).

In light of the foregoing, the Correctional Defendants can be held liable for decisions of medical personnel only if they undertook actions which bear a causal relationship to the purported violation of Downes' constitutional rights.   To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the Correctional Defendants, Downes must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Downes has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the Correctional Defendants directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action.  In addition, Downes has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical

treatment in the face of which these Defendants failed to take corrective action. Rather, the Warden Myers testified that employees of Wexford with medical training made all decisions related to the healthcare of inmates including Downes. (Doc. 41-1 at p. 2). The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the Correctional Defendants. Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified. *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of the Correctional Defendants with respect to liability based on the theory of respondeat superior. Furthermore, even had Downes presented a proper basis for the claims lodged against the Correctional Defendants, the evidentiary materials before the court demonstrate that health care personnel did not act with deliberate indifference to his medical needs, including his back and neck pain, scrotal abscess and other conditions.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The Defendants' motions to dismiss and or for summary judgment (Docs. 38 and 41) be GRANTED.

2. Judgment be GRANTED in favor of the Defendants.

3. This case be DISMISSED with prejudice.

4. Costs be taxed against the Plaintiff.

On or before **April 20, 2022** the parties may file objections to this Recommendation.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 6th day of April, 2022.


 /s/ Charles S. Coody
 UNITED STATES MAGISTRATE JUDGE